Jeffery **DILLON**, Appellant,

v.

The **STATE** of Texas, Appellee.

Cindy **DILLON**, Appellant,

v.

The **STATE** of Texas, Appellee.

Nos. 57756, 57757.

Court of Criminal Appeals of Texas, Panel No. 3.

Nov. 22, 1978.

Rehearing En Banc Denied Dec. 20, 1978.

James H. Kreimeyer, Belton, court appointed, for appellant.

Arthur C. Eads, Dist. Atty. and James T. Russell, Asst. Dist. Atty., Belton, for the State.

Before ROBERTS, ODOM and TOM G. DAVIS, JJ.

## OPINION

ODOM, Judge.

These are appeals from convictions for involuntary manslaughter in which Jeffery Dillon and Cindy Dillon pled nolo contendere to the court and received punishment terms of five years and three years respectively.

Appellants were indicted for murder under V.T.C.A., Penal Code Sec. 19.02, by failing to provide necessary food and medical care as was their duty as parents, as a result of which their infant child starved to death. They pled nolo contendere to the lesser included offense of involuntary manslaughter under V.T.C.A., Penal Code Sec. 19.05.

In their sole ground of error appellants contend the evidence is insufficient to support their pleas to involuntary manslaughter, and that the evidence, at most, shows criminally negligent homicide. The culpable mental state for murder is to intentionally or *knowingly* cause the death of an individual. The culpable mental state for involuntary manslaughter is to *recklessly* cause the death of an individual. *Criminal negligence* is the culpable mental state applicable to criminally negligent homicide. V.T.C.A., Penal Code Sec. 19.07.

V.T.C.A., Penal Code Sec. 6.03 defines the culpable mental states. The definitions of the three culpable mental states referred to in the preceding paragraph are:

"(b) A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a re-

sult of his conduct when he is aware that his conduct is reasonably certain to cause the result.

"(c) A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

"(d) A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint."

The distinctions among these culpable mental states, as applied to appellants' awareness of the fatal consequences of their failure to fulfill their parental duties to provide food or medical care for their infant child (as alleged in the indictment), are distinctions among whether (1) appellants knew their conduct was reasonably certain to cause their child's death, (2) appellants were aware of but consciously disregarded a substantial and unjustifiable risk that their child's death would result from their conduct, or (3) appellants ought to have been aware of a substantial and unjustifiable risk that their child's death would result.

Appellants do not contest the fact that a substantial and unjustifiable risk of their child's death existed. They argue, instead, that certain testimony showed:

". . . that Appellants perhaps ought to have been aware of the risk involved to their daughter and that their failure to be aware of the risk constituted a gross deviation from the standard of care of an ordinary person under the circumstances. There is no evidence, on the other hand, that Appellants actually knew of the risk involved to their daughter but consciously disregarded it."

The question and answer by Dr. Allen upon which appellants rely for this argument are:

"Q. But apparently there were a great many people, while they were concerned about the child, were not so aware of the eminent danger to the child. That's what my question is addressed to primarily.

"Is it possible that the parents could have been concerned without being aware of the danger and the potential result—inevitable result, I would say? Could they have been aware of the condition without being aware of the fact that death was eminent?

"A. I think that's possible. I think that death is a hard thing to know about without experience. Maybe they could look at this child and not realize that they could be killing the child.

"I don't think I could have, but maybe they could have."

This testimony does not render the evidence insufficient to show appellants were aware of the risk involved.

First, the question and answer are addressed more to whether appellants knew or realized that death would *result* than to whether they were aware of the *risk* of death. As such, the question and answer go more to whether appellants possessed the requisite culpable mental state for murder than for involuntary manslaughter.

 Second, proof of a culpable mental state generally relies on circumstantial evidence. Upon consideration of recklessness versus criminal negligence, whether one is aware of a requisite risk or simply should be aware of it, is a conclusion to be drawn through inference from all the circumstances by the trier of fact. The statement by a

witness that it is *possible* that a person was not aware of a risk of which most persons similarly situated would be aware is simply a statement of the obvious. The issue is not one of theoretical possibility, but one of whether, given all the circumstances, it is reasonable to infer that the particular individual on trial was in fact aware of the risk. If such an inference is reasonable, it is for the trier of fact to determine which circumstances to accept as proven and whether to draw that inference, and it is not for this Court to overturn such an inference, drawn on the whole of the circumstances, because one witness testified to the possibility that the inference could be false even though soundly supported by the circumstances. Such an approach to the issues of proof of culpable mental states would render the evidence insufficient in all cases, as it is always *possible* that one's intents are different than what all outward appearances would indicate.

The ground of error is overruled.

The judgment is affirmed.

ROBERTS, Judge, dissenting.

Appellants contend that the evidence was insufficient to support their pleas of nolo contendere because the State failed to prove that they "recklessly" caused the death of their infant child, Rita Dillon.[1] I would reverse the judgments of conviction.

Rita Dillon died on January 22, 1977 at the approximate age of five months; the cause of death was starvation. Although the exact date is not reflected by the record, it appears that sometime during the month of November, 1976, appellants brought Rita to the emergency room of Darnall Army Hospital at Fort Hood in order to receive treatment for ant bites. The record reflects that Rita was examined and treated by a physician's assistant who noted on his report that "Examination was normal."

Rose Hundley, a nurse at the hospital, testified that on January 20, 1977, she met appellants at a bowling alley on post at Fort Hood. Hundley testified that she was "shocked" at the child's appearance. She also testified that when she was holding Rita, Jeffery Dillon commented, "Don't you think she is skinny?" Hundley finally testified that when she returned to the hospital that evening she informally notified a few staff members about Rita's condition.

The record further reflects that appellants were prompted to take Rita to the emergency room for the second time on January 22, 1977, after they discovered her lying in her crib face down with mucous covering her face. En route to the hospital, appellants decided to stop at a convenience drive-in grocery and call for a police escort. An emergency medical technician was called to the scene and found that Rita was already dead.

Dr. William Allen, chief of pediatrics at Darnall Army Hospital, testified that it was his opinion, based on the autopsy report, that Rita's death was caused by marasmus, or protein calorie malnutrition starvation. Upon examination by the court, Dr. Allen further testified:

"Q We're all familiar with the failure of children to thrive and this sudden infant death syndrome that is discussed in public media every day.

But given the three criteria that you mentioned a moment ago, the parents that tend in that direction, the social crisis the child tends to be a little bit cranky, and the rigors of Army life and the immaturity of the parents, or lack of knowledge on the part of the parents, wouldn't each one of those tend to amplify the other and is it possible that the child could just die of benign neglect without the knowledge of the parents?

"A No, sir.

---

1. Appellants, originally indicted for the offense of murder under V.T.C.A., Penal Code, Sec. 19.02, entered pleas of nolo contendere to the lesser included offense of involuntary man- slaughter under V.T.C.A., Penal Code, Sec. 19.-05(a)(1) which provides that "a person commits an offense if he recklessly causes the death of an individual."

"Q It couldn't starve to death without them knowing it?

"A No, sir.

"Q Now I'm talking about now, given all the input that we have discussed a moment ago.

"A Sir, I honestly suppose anything is possible, but I don't see how the kid can get in this shape without—

"Q Would you categorize that as neglect, or abuse?

"A I would categorize that as one of the most horrible things I've ever seen in my life, *neglect and abuse,* and whatever else you want to call it.

"Q The thing that concerns me, if it is that horrible, why the emergency protection authority given by law has not been implemented to have that child placed in emergency protection, because, apparently, there were people who knew about it, but not people with your knowledge and training?

"A That's correct. I think that if anyone—if any knowledgeable person—I think if any person knowledgeable of the system had seen the child for even a second, that things would have been done.

But, unfortunately, I think the system was unaware that this child existed.

"Q But apparently there were a great many people, while they were concerned about the child, were not so aware of the eminent danger to the child. That's what my question is addressed to primarily.

Is it possible that the parents could have been concerned without being aware of the danger and the potential result—inevitable result, I would say? Could they have been

aware of the condition without being aware of the fact that death was eminent?

"A I think that's possible. I think that death is a hard thing to know about without experience. *Maybe they could look at this child and not realize that they could be killing the child.*

I don't think I could have, but maybe they could have." (Emphasis added.)

The autopsy conducted on Rita showed, inter alia, that while the child's stomach contained no recently digested food the terminal colon contained several well-formed, normal-appearing fecal masses.

A person commits the offense of involuntary manslaughter when he recklessly causes the death of an individual. *Brooks v. State,* 548 S.W.2d 680 (Tex.Cr.App.1977). Reckless conduct as defined by V.T.C.A., Penal Code, Sec. 6.03(c)[2] involves conscious risk creation; that is, the actor is aware of the risk surrounding his conduct or the results thereof, but consciously disregards that risk. See also *Lewis v. State,* 529 S.W.2d 550, 553 (Tex.Cr.App.1975). The reckless person does not desire that the risk occur nor is he reasonably certain that it will occur; however, *he does perceive it.* Thus, where a person drives while intoxicated, speeds through a school zone when small children line the sides of the street, or shoots at beer cans floating on a lake while water skiers go by, the fact finder may infer that the actor perceived the risk—of running over a child, of shooting a skier— and that he consciously disregarded that risk. See V.T.C.A., Penal Code, Sec. 6.03, Practice Commentary.

Criminal negligence as defined by V.T. C.A., Penal Code, Sec. 6.03(d)[3] involves in-

2. "A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the

standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint."

3. "A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the cir-

attentive risk creation; that is, the actor *ought* to be aware of the risk surrounding his conduct or the results thereof. The essence of criminal negligence is the actor's failure to perceive the risk. See also *Lewis v. State,* supra. Thus, where a person passes a long line of cars when his vision of on-coming traffic is obstructed, or leaves a brush fire untended in a residential neighborhood in a strong wind, or locks a young child in a car for several hours on a hot summer afternoon, the fact finder may infer that the actor ought to have perceived the risk incident to his negligent conduct. See V.T.C.A., Penal Code, Sec. 6.03, Practice Commentary.

As defined, criminal negligence is a lesser culpable mental state than recklessness; mere proof of criminal negligence will not suffice to support a conviction for the offense of involuntary manslaughter. V.T.C.A., Penal Code, Sec. 6.02; *Lewis v. State,* supra.

The evidence introduced in support of appellants' no contest pleas shows that approximately two months before Rita Dillon died appellants were informed by a physician's assistant that their child was "normal"; that two days prior to Rita's death, nurse Hundley saw Rita, became concerned about the child's health and casually informed other hospital staff members about Rita's condition; that appellant Jeffery Dillon at the bowling alley commented to Hundley while she was holding Rita: "Don't you think she is skinny?", and finally, that Dr. Allen testified that it was possible for appellants, prior to Rita's death, to look at their child and not realize it was starving to death.

I would hold that from the evidence presented the trial court was unauthorized to infer that appellants actually perceived the risk to their child's life and consciously chose to disregard that risk. Thus, the State failed to prove beyond a reasonable doubt the requisite culpable mental state of

recklessness, an essential element of the offense charged. The evidence at best shows that appellants were criminally negligent. See Sec. 6.03(d), supra.

For the reasons stated herein, I respectfully dissent.